### IN THE UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF ARKANSAS
### FAYETTEVILLE DIVISION

**TIG INSURANCE COMPANY**                                         **PLAINTIFF**

                    **v.**              **Civil No. 04-5117**

**NATIONAL UNION FIRE INSURANCE**
**COMPANY OF PITTSBURGH, PA, A**
**PENNSYLVANIA CORPORATION; and**
**AMERICAN HOME ASSURANCE COMPANY,**
**A NEW YORK CORPORATION**                                       **DEFENDANTS**


### O R D E R

On the 11ᵗʰ day of August, 2005, the captioned matter came on for hearing on defendants' **Motion For Summary Judgment** (document #18) and plaintiff's **Motion For Partial Summary Judgment** (document #21), and from said motions, the supporting documentation, the responses thereto, and the arguments of counsel in open court, the Court finds and orders as follows:

1.   Plaintiff TIG Insurance Company ("TIG") seeks to recover sums paid on behalf of its insured Latco, Inc. ("Latco") -- pursuant to a policy of excess insurance -- from Latco's primary insurers, defendants National Union Fire Insurance Company of Pittsburgh, PA ("National Union") and American Home Assurance Company ("American Home").   Two counts are asserted in the Complaint, one for equitable subrogation and one that vaguely refers to "equitable contribution, equitable indemnification, unjust enrichment, or other applicable rule of law or equity."

Defendants denied the material allegations of the Complaint,

and now all parties move for partial or total summary judgment.

2. Summary judgment should be granted when the record, viewed in the light most favorable to the nonmoving party, and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. **Walsh v. United States, 31 F.3d 696 (8th Cir. 1994).** Summary judgment is not appropriate unless all the evidence points toward one conclusion, and is susceptible of no reasonable inferences sustaining the position of the nonmoving party. **Hardin v. Hussmann Corp., 45 F.3d 262 (8th Cir. 1995).** The burden is on the moving party to demonstrate the non-existence of a genuine factual dispute; however, once the moving party has met that burden, the nonmoving party cannot rest on its pleadings, but must come forward with facts showing the existence of a genuine dispute. **City of Mt. Pleasant, Iowa v. Associated Electric Co-op, 838 F.2d 268 (8th Cir. 1988).**

3. The parties stipulate to the following facts:

(a) Latco is an Arkansas corporation whose principal place of business is Lincoln, Arkansas. Latco is in the business of constructing poultry houses.

(b) In early 1998, Latco and CTB, Inc. ("CTB") entered into a contract pursuant to which Latco was to construct approximately 360 poultry houses in Alabama for individual poultry growers ("the Growers"). The parties agree that a written contract was

prepared, but no copy of it has been made a part of the record.

(c)  CTB was working under a written contract with a poultry integrator, Charoen Pokphand, USA ("CP") pursuant to which CTB agreed to construct the poultry houses for the Growers, who were contracted to CP.  Each Grower paid CTB (and/or CP) for construction of the poultry houses.

(d)  Construction of the poultry houses began in January, 1998, and continued until at least January, 1999.[1]  The project utilized as many as 450 workers organized into seventeen work crews, working at various sites in multiple counties.

(e)  The Growers complained of a variety of construction defects in the poultry houses.  These defects were not identical, but varied from Grower to Grower.  The alleged defects included -- but were not limited to -- the following:

* discoloration of roofs attributed to oxidation of sheet metal;

* the use of cheaper cellulose insulation, which absorbed water, rather than fiberglass insulation;

* gas heaters that would not light properly;

* clogging and flooding of drain pipes, resulting in collapse of feed bins;

* malfunctioning water filtration systems, resulting in higher than acceptable levels of iron in water meant to be given

---

[1]The parties were unable to agree on the last date for construction.

to poultry for drinking;

* improperly installed and nonfunctioning fogger pads;

* improper installation of wiring, including wiring that was exposed;

* leaking roofs (resulting in flooding in the poultry houses) attributable to the use of nail guns instead of screws, failure to use washers with nails, failure to use nails with ribbed shanks;

* improper and insufficient preparation of construction pads, resulting in flooding of some poultry houses;

* improper placement of posts, which contributed to flooding and leaking of some poultry houses;

* improper placement of purlins (rafter supports);

* bad lumber;

* gaps in the walls, resulting in inability to seal some of the poultry houses and maintain thermostatic pressure;

* drain pipes that were not of sufficient diameter for draining, contributing to flooding in some of the houses;

* malfunctioning curtains and lights;

* leaks in gas lines;

* leaking feed bins that resulted in clogged feed lines;

* inadequate insulation;

* doors that were difficult to open and would not seal well;

* loose water lines and easily broken PVC pipe;

* fans that came off their shafts and fan blades that were easily broken;

* concrete pads containing depressions that held rainwater prior to construction;

* delivery of building materials to the site weeks in advance of their use, leaving them exposed to damage from the elements;

* broken curtain ties; and

* electrical junction boxes without covers.

(f)  Starting in June, 1999, the Growers filed 53 separate lawsuits (the "Underlying Suits") against Latco and various subcontractors and vendors for damages arising out of alleged defects in the poultry houses.

(g)  Latco had in place, during the period when the poultry houses were being constructed, various policies of primary and excess commercial general liability insurance which were potentially applicable to the claims of the Growers, as follows:

* National Union issued Policy No. GL 146-33-69 to Latco, affording primary coverage for the period 5/1/97 to 5/1/98.

* National Union issued Policy No. GL 457-00-34 to Latco, affording primary coverage for the period 5/1/98 to 5/1/99.

* American Home issued Policy No. GL 457-00-34 to Latco, affording primary coverage for the period 5/1/99 to 5/1/00.

* TIG issued Policy No. XLB 929 1395 to Latco, affording excess coverage for the period 5/1/98 to 5/1/99.

* TIG issued Policy No. XLB 929 1646 to Latco, affording excess coverage for the period 5/1/99 to 5/1/00.

(h)  A stipulated copy of each policy is attached to the Statement of Stipulated Facts, and it is from those copies that the Court has drawn all quotations of policy language in this Memorandum Opinion.  Policies are referred to by number.

(i)  National Union and American Home agreed to defend Latco in the Underlying Suits, pursuant to reservations of rights.  The parties stipulated to copies of the reservation of rights letters.

(j)  In early December, 2001, the Growers offered to settle the Underlying Suits with Latco for $4,000,000, with the offer to expire on December 18, 2001.  One vendor defendant contributed $65,000 to the settlement, and Latco demanded that its insurers fund the balance.

(k)  On or about December 4, 2001, TIG made demand by letter on National Union and American Home to settle all claims in the Underlying Suits.  National Union and American Home refused this demand on or about December 5, 2001, taking the position that the claims of the Growers were not covered under their respective policies.

(l)  Latco demanded that TIG fund the settlement for all amounts in excess of the amount National Union and American Home

would pay.

(m)  National Union eventually contributed $1,945,000 toward settlement of the Underlying Suits, and TIG contributed $1,990,000.  Prior to making its contribution, TIG sent two reservation of rights letters to Latco.  The parties stipulated to copies of these letters.

(n)  After the Underlying Suits were settled, Latco executed a release in favor of National Union and American Home (the "Release"), releasing them of any further obligations pursuant to the Underlying Suits and the CP contractors.  The parties stipulated to a copy of the Release, which is dated March 19, 2002.

4.  Defendants offer five arguments in support of their claim that they are not liable to TIG for the sums TIG paid to settle the Underlying Suits, to-wit:

(a)  The construction defects asserted in the underlying claims do not constitute an "occurrence," nor are they "property damage," as defined in their Policies.

(b)  Even if the claims constitute an "occurrence" as defined in their Policies, they constitute only one occurrence, and defendants have paid more than the "per occurrence" limit of their Policies.

(c)  Even if there were multiple "occurrences," coverage is excluded under the "business risk exclusions" of the Policies.

(d)  Even if there were multiple "occurrences" which were not excluded under the Policies, TIG's claims are barred because TIG settled the claims against the Growers without specifically reserving its right to seek contribution from defendants.

(e)  TIG cannot recover because, following the settlement, Latco released National Union and American Home from liability, and TIG, having only the rights that Latco possesses, has no claim against National Union or American Home.

The Court will examine these arguments in the order in which they were presented.

5.  <u>Was there an "occurrence" and was there "property damage"</u>?

(a)  Defendants first contend that the construction defects asserted in the Underlying Suits do not constitute an "occurrence" as that term is defined in their Policies.

Disposition of this argument turns on policy language, which requires the Court to determine which policies are relevant.  The parties stipulate that construction of the poultry houses began in January, 1998, and continued until at least January, 1999.  That period of time would implicate the two National Union policies, Policy 146-33-69 and Policy 457-00-34.

Both Policy 146-33-69 and Policy 457-00-34 cover "sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies."  The

-8-

insurance "applies to" property damage only if it is caused by an "occurrence." An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

Defendants rely on cases from jurisdictions other than Arkansas, holding that construction defects are not occurrences because they are not accidents, and on **Nabholz Construction Corp. v. St. Paul Fire and Marine Insurance Co.**, **354 F.Supp.2d 917 (E.D.Ark. 2005)**, in which Judge G. Thomas Eisele "predicts that the Arkansas Supreme Court would elect to join 'the majority of courts in the country [which] have concluded that defective workmanship does not constitute an "occurrence" in policies such as the one here'."

TIG relies on **United States Fidelity & Guaranty Company v. Continental Casualty Company**, **353 Ark. 834, 120 S.W.3d 556 (2003)**, which involved a dispute over whether construction defects fell within the definition of an occurrence in a commercial general liability policy where "occurrence" was defined in the same terms as those now under consideration. The Arkansas Supreme Court there held as follows:

> Appellants argue that the "occurrence" that gave rise to the property damage was Ray's defective workmanship on the Wal-Mart projects. The policy defines an "occurrence" as "an accident." We have defined an "accident" as "an event that takes place without one's foresight or expectation -- an event that proceeds from an unknown cause, or is an unusual effect of a known

-9-

cause, and therefore not expected." Because the policy
has defined "occurrence," and because we have defined
"accident," we conclude that the remaining fact question
which must be resolved in this case before coverage can
be determined is whether Ray's workmanship on the Wal-
Mart projects constituted an "accident."

**353 Ark. at 845, 120 S.W.3d at 563** (internal citations omitted).

The Court agrees with the analysis in **<u>Nabholz</u>**, but does not
find it completely dispositive of the issue. Various types of
harm were claimed by the Growers. Some of the damage was to the
poultry houses themselves (defective workmanship), but some was to
their contents (poultry and feed), and some was economic damage
resulting from loss of use. The following passage from a New
Jersey case cited in **<u>Nabholz</u>** is instructive in understanding the
difference:

> When a craftsman applies stucco to an exterior wall of
> a home in a faulty manner and discoloration, peeling and
> chipping result, the poorly performed work will perforce
> have to be replaced or repaired by the tradesman or by
> a surety. On the other hand, should the stucco peel and
> fall from the wall, and thereby cause injury to the
> homeowner or his neighbor standing below or to a passing
> automobile, occurrence of harm arises which is the
> proper subject of risk-sharing as provided by the type
> of policy before us in this case. The happenstance and
> extent of the latter liability is entirely
> unpredictable[;] the neighbor could suffer a scratched
> arm or a fatal blow to the skull from the peeling
> stonework. Whether the liability of the businessman is
> predicated upon warranty theory or, preferably and more
> accurately, upon tort concepts, injury to persons and
> damage to other property constitute the risk intended to
> be covered under the [commercial general liability
> coverage].

**354 F.Supp.2d at 922-23.**

The Complaints to which the parties stipulated show that the

Growers complained about "a loss of production time through necessity for repairs."  In addition, the defects in workmanship to which the parties stipulated included some which, drawing inferences favorable to TIG, would have caused damage to non-defective parts of the poultry houses, to feed, and to the poultry itself, such as flooding, the collapse of feed bins, inability to maintain proper temperatures in the poultry houses, and water impurities.  Supporting these inferences, TIG offered evidence that the Growers suffered a higher than normal loss of poultry in the houses.

Because this case involves types of harm other than defective workmanship, the Court believes that the holding of **Nabholz** can be applied without doing violence to the holding of **United States Fidelity & Guaranty**.  To the extent that the property damage in question is merely defective workmanship which must be torn out and redone, it is not an "accident," and therefore not an "occurrence" under the Policies.  However, to the extent that defective workmanship caused leaking or flooding that damaged non-defective portions of the poultry houses, death of chickens, loss of feed, loss of use of the poultry houses, or similar damages, such was not "expected" and, therefore, was an accident and an "occurrence" under the terms of the Policies.  A genuine issue of material fact exists regarding whether -- and to what extent -- any of the damages alleged by the Growers was an "accident" as the

Arkansas Supreme Court has defined that term.  Summary judgment is, therefore, not appropriate on this asserted basis.

(b)  Defendants also contend that the damages alleged in the Underlying Suits do not constitute "property damage" as that term is defined in their Policies.  They claim that "[t]his case involves only the removal and replacement of defective work and it does not involve any damage to any other property."

While conceding that some of the damages claimed by the Growers do not constitute "property damage" as defined in the National Union and American Home policies, TIG contends that damage to the poultry being raised in the poultry houses due to malfunctioning equipment, and loss of use of the houses, does constitute "property damage" under the terms of the Policies.

Both Policy 146-33-69 and Policy 457-00-34 define "property damage" as follows:

"Property damage" means:

a.    Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.    Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Defendants cite the following passage from **Law and Practice of Insurance Coverage Litigation**, **§45.4,** in support of their position:

The definition's inclusion of the word 'physical' resulted in the courts finding no coverage for diminution in value damages where there was no physical damage to the structure and the only harm suffered was the defective material and work itself . . . . Generally, the cost of removing, repairing or replacing the defective material or work is not covered, provided that no physical damage to the property of others occurs, including other trades' work, as a result of such activities.  A claim involving only the removal, repair and/or replacement of the defective material or work does not constitute covered 'property damage.'

TIG does not dispute the foregoing statement of the law, but points out that the Growers alleged loss of use of the poultry houses as a result of construction defects, and offered evidence that they also suffered greater-than-normal death losses in their flocks because of the defects.  These types of losses clearly fall within the Policies' definition of property damage. The Court is persuaded, therefore, that summary judgment on this basis should be denied.

6.  <u>Were there multiple occurrences</u>?

As an alternative to their claims that the allegations of the Underlying Suits are not covered at all by their Policies, defendants contend that -- even if the claims constitute an "occurrence" as defined in the Policies --  they constitute only one occurrence, and they have paid more than the "per occurrence" limit of the applicable Policy[ies].

Defendants focus their argument on the fact that Latco worked pursuant to one contract with CTB, rather than multiple contracts with the individual Growers, and that all the poultry houses were

built according to the same specifications.  They also contend that the alleged defects are all basically the same.  From these circumstances, they argue that the issue is controlled by **Travelers Indemnity Company v. Olive's Sporting Goods, Inc.**, **297 Ark. 516, 764 S.W.2d 596 (1989),** in which the Arkansas Supreme Court held that the number of "occurrences" under a policy is determined by looking at the cause of an incident, rather than its effect.  Thus, the sale of two weapons to an individual who later used them to shoot several people was deemed one occurrence (one sale, which led to the shootings), rather than several occurrences (several shootings which resulted from one sale).

TIG agrees that Arkansas looks to the cause of damage to determine the number of occurrences, but disputes defendants' assertion that the alleged defects in the poultry houses were all basically the same.  It argues that there were different causes for the defects, i.e., not every poultry house was defective for the same reasons.  In some the cause was the type or quality of construction materials (such as bad lumber or cheap insulation); in some, it was the construction methods used (such as the use of nail guns or the improper spacing of purlins);  in some it was the installation of defective equipment;  and in some it was a combination of causes.  TIG also argues that "because work on one building does not cause damage to another building," damage to each poultry house is a separate occurrence, citing **Insurance**

-14-

**Company of North America v. National American Insurance Company of California**, **37 Cal.App. 4th 195 (1995)** and other construction cases with similar holdings.

In addition, TIG argues that some of the houses were built during the time covered by Policy 146-33-69, others during the period covered by Policy 457-00-34. Those houses which sustained damage during the period covered by Policy 146-33-69 would trigger its limits; those which sustained damage during the period covered by Policy 457-00-34 would trigger different limits. Thus, in terms of both timing and causation, TIG contends that there is more than one "occurrence."

The parties stipulated that the construction defects in the poultry houses were not identical, but varied from Grower to Grower. In addition, while some of the defects may have related to the plans and specifications applicable to all the poultry houses, some clearly related to construction practices such as the use (or misuse) of nail guns or the failure to level or slope surfaces properly to direct water runoff. It follows from the stipulated facts that there must have been more than one cause of damage, although the Court cannot -- on the basis of the stipulated facts -- determine how many different causes there were, nor precisely when they occurred. Summary judgment on this asserted basis is, therefore, not proper.

7. <u>Do any of the "business risk exclusions" of the Policies</u>

apply?

Defendants contend that three "business risk exclusions" in their Policies preclude coverage.

(a) Subsection 2(j) of the Commercial General Liability Coverage Form of all three of defendants' Policies excludes from coverage "'property damage' to . . . [t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations."

Defendants contend the parties stipulated that "damage to the property at issue was discovered while construction activities by the insured and subcontractor were ongoing, well before completion of the actual project," thus triggering this exclusion. They also rely on the position they have taken in other arguments in this case, that the only damage was to the work of Latco, not to other property of the Growers.

TIG, for its part, takes the position that the work on any given poultry house was completed before the defects in that house were discovered, and that as this exclusion applies only to damage during ongoing operations, it is not applicable. TIG agrees that this exclusion applies to Latco's work, but asserts that there is other damage -- loss of use and loss of poultry -- which does not fall within the exclusion. Finally, TIG argues that the exclusion

-16-

applies only to the specific, particular area in which on-going work was taking place, not to the overall completed product (the poultry house) that was damaged by particular work.

The Court does not agree with defendants' characterization of the parties' stipulated facts, i.e., that the parties stipulated that "damage to the property at issue was discovered while construction activities by the insured and subcontractor were ongoing, well before completion of the actual project." While it is true that the stipulated facts suggest that damages to some of the poultry houses were discovered before all the poultry houses were completed, they do not suggest that in each case, damages to any given poultry house were discovered before that particular house was completed. Given the disposition of the other issues addressed *supra*, and the "ongoing operations" nature of this exclusion, the Court finds there is a genuine issue of material fact on this issue, and accordingly, summary judgment for defendants on this basis is not appropriate.

(b) Subsection 2(m) of the Policies excludes from coverage property damage to "impaired property" or "property that has not been physically injured, arising out of . . . failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms."

The Policies define "impaired property" as:

tangible property, other than "your product" or "your work," that cannot be used or is less useful because. .

-17-

. [y]ou have failed to fulfill the terms of a contract
or agreement; if such property can be restored to use by
. . . [y]our fulfilling the terms of the contract or
agreement.

In response to defendants' argument that this exclusion
forecloses coverage, TIG counters that the chickens which died as
a result of any defect in the poultry houses cannot be "restored
to use."  A similar inference can be drawn with regard to any feed
that may have been damaged.  The Court does not find defendants'
arguments persuasive on this point nor does it believe that this
provision excludes coverage for the loss of use while defective
workmanship was being corrected.  Summary judgment on this basis
will therefore be denied.

(c)  Finally, an Endorsement to each of the Policies excludes
from coverage "[p]roperty damage arising out of professional
services performed by or on behalf of the Insured (including, by
way of example and not limited to, surgical, medical, legal,
architectural, engineering, accounting and consulting services)."
This argument may be quickly disposed of, however, as defendants
do not seriously contend that Latco was responsible for the design
or engineering of the poultry houses.  Accordingly, the Court
rejects this contention.

8.  Are TIG's claims barred by the settlement?

Defendants contend that TIG is barred from recovering on an
equitable subrogation claim against them because it participated
in the settlement of the Growers' claims without expressly

-18-

reserving the right to obtain contribution from them. They cite the Court to the case of **Design Professionals Insurance Companies, Inc. v. St. Paul Fire and Marine Insurance Company, 123 N.M. 398, 940 P.2d 1193 (1997),** which involves facts similar to those now before the Court. The New Mexico Court of Appeals there held that where two insurers "fully participated" in settlement of a claim against their mutual insured, "without objection or reservation of rights, either participant should in equity be held to have waived any rights to contribution from the other and should be estopped from recovering any amount from the other insurer." **123 N.M. 403, 940 P.2d 1198.**

The court in **Design Professionals** recognized that New Mexico case law required a showing of detrimental reliance to support an estoppel, but held that

> absent evidence to the contrary, reliance should be presumed when two insurers . . . enter into settlement negotiations with their insured and a claimant, and, without objection or reservation, finalize a settlement to the apparent satisfaction of all parties.

**123 N.M. 403, 940 P.2d 1198.**

> Under Arkansas law, which applies to this diversity case,

> the party claiming estoppel must prove he relied in good faith on some act or failure to act by the other party and that, in reliance on that act, he changed his position to his detriment. A party who by his acts, declarations, or admissions, or by his failure to act or speak under circumstances where he should do so, either with design or willful disregard of others, induces or misleads another to conduct or dealings which he would not have entered upon, but for such misleading

influence, will not be allowed, because of estoppel,
afterward to assert his right to the detriment of the
person so misled. . . . It is well settled that whether
estoppel is applicable is an issue of fact to be decided
by the trier of fact.

**Undem v. First National Bank**, **46 Ark. App. 158, 879 S.W.2d 451**

**(1994)** (internal citations and quotation marks omitted).

On the issue of reliance, the Court believes that defendants'

cited case differs significantly from the case at bar. The excess

insurer in **Design Professionals** did nothing and said nothing to

suggest that it objected to contributing to the settlement. Here,

there is evidence indicating that TIG made it clear that it

expected defendants to fund the settlement. Although TIG

eventually participated in the settlement, the facts could well

support an inference that it did not do so without objection.

When the settlement opportunity arose, there was a very short

"window of opportunity" for its acceptance -- perhaps three weeks

in late November and early December, 2001.  TIG immediately sent

AIG (the parent company of both defendants) two letters demanding

that defendants settle with the Growers to protect both Latco and

TIG.  Those letters, dated November 26, 2001, and December 4,

2001, both contain the following language:

> TIG would be considered the equitable subrogee of our
> insured for our layer of coverage.  This matter presents
> exposure to TIG to a verdict in excess of your policy
> limits.  As the equitable subrogee of our insured for
> our layer of coverage you have a duty to protect TIG
> from a verdict in excess of your policy limits.  You
> have the opportunity now to settle this matter within
> your layer of coverage and eliminate all exposure to our

insured and TIG.

> TIG hereby demands immediate consideration is given to
> settle within your policy limits.  If you fail to do so
> TIG will look to your to satisfy the entire verdict in
> this matter whether or not such verdict were to exceed
> your policy limits.

The two demand letters indicate that National Union was willing to contribute $1,000,000 (its "per occurrence" limits under one of its policies), but that there was a dispute about whether more than one of defendants' policies was applicable and whether there was more than one occurrence.

The settlement was reached on or about December 18, 2001. The stipulated facts do not explain the circumstances under which National Union paid $1,955,000, nor is there any evidence before the Court about the conversations that took place between agents of the parties leading up to the settlement.  However, viewing the stipulated facts in the light most favorable to TIG, and giving TIG the benefit of all favorable inferences that can be drawn from those facts, the Court believes there are genuine issues of material facts as to whether TIG continued to maintain its objection to participating in the settlement; as to whether TIG took part only to protect its interests and those of Latco when defendants refused to fully fund the settlement; and as to whether National Union detrimentally relied on any lack of objection by TIG in participating in the settlement.

For the foregoing reasons, the Court finds that summary

judgment on the basis of the settlement is not appropriate.

       9.   <u>Are TIG's claims barred by the Release</u>?

     Defendants also argue that TIG cannot maintain an action in equitable subrogation because of Latco's release of defendants from all liability. This follows, say defendants, because TIG would have had only the rights that Latco possessed -- and that it has no rights following the signing of the Release by Latco.

     TIG responds that National Union and American Home obtained the Release without TIG's knowledge, and that it had put Latco on notice of its subrogation rights, which changes the applicable rule of law.

     While it is true that ordinarily a subrogee has no greater rights than its subrogor, there is an exception in Arkansas case law where the subrogor settles with (and presumably thereby releases) a tortfeasor without the knowledge of the subrogee. See **Daves v. Hartford Accident & Indemnity Co.**, **302 Ark. 242, 788 S.W.2d 733 (1990)** (insurer's settlement without payment to one claiming subrogation rights was "simply a well designed and calculated attempt to escape its acknowledged duty" and insurer was not allowed to thus "ignore its responsibility") and **Floyd v. Home Insurance Co.**, **250 Ark. 915, 467 S.W.2d 698 (1971)** ("no act of an insured releasing a tort-feasor from liability could defeat the insurer's rights when it was done without knowledge or consent of the insurer and with the tort-feasor's full knowledge of the

-22-

insurer's right of subrogation").

It is stipulated that Richard Latta executed the Release on behalf of Latco on March 19, 2002, some three months after the agreement to settle the Underlying Suits was reached. It is also stipulated that TIG had furnished Latco two letters, during the settlement negotiations, stating that "TIG has the right to recover any defense costs, settlement or judgment from any other insurance carriers and from any third party, which we may exercise by filing a lawsuit against such persons or entities in your name." The Release is between Latco and the defendants, and is signed only by an agent of Latco. There is no evidence showing when or how TIG learned of its existence.

From the foregoing facts it might be inferred, favorably to TIG, that defendants and Latco wholly circumvented TIG in negotiating the Release, to their mutual benefit and to the detriment to TIG. If such should prove to be the case, TIG's claim against defendants would fall within the exception stated in **Daves** and **Floyd**. The Court, therefore, concludes that genuine issues of material fact remain to be determined with regard to whether TIG's claims are barred by the Release.

10. It follows from the foregoing discussion that defendants' motion for summary judgment must be denied.

11. TIG, for its part, contends that it is entitled to summary judgment on the following issues:

(a)   that  the  defects  in  the  poultry  houses  constituted multiple occurrences rather than a single occurrence;

(b)   that all applicable primary insurance must be exhausted before an excess policy has an obligation to cover a loss (the rule of "horizontal exhaustion");

(c)   that an excess carrier which contributes to a settlement has  a  right  of  reimbursement  from  the  primary  carrier  if  the primary carrier's limits have not been exhausted; and

(d)   that a primary carrier cannot defeat an excess carrier's right to reimbursement by a settlement with their mutual insured.

12.   The Court has already addressed issues 11(a) and 11(d), and will not devote further time to them, inasmuch as there are fact  issues  to  be  determined  in  connection  with  each,  making summary judgment inappropriate.

13.   The second issue (11(b)) appears to the Court to be one of  contract  rather  than  of  law.   TIG's  obligation  to  pay  is governed by the terms of its contracts with Latco.  Both Policy XLB 929 1395 and Policy XLB 929 1646 provide as follows:

> WE  will  pay  on  YOUR  behalf  the  sums  that  YOU  shall become legally obligated to pay as damages because of . . . PROPERTY DAMAGE . . . caused by an OCCURRENCE to which this policy applies during this POLICY PERIOD. . . . WE shall be liable only for that portion of the ULTIMATE NET LOSS in excess of . . . [t]he applicable limits  of  the  UNDERLYING  INSURANCE  listed  in  the attached Schedule of UNDERLYING INSURANCE (whether such insurance is collectable or not. . . .

Even without going into the definitions of all the upper case

terms set out therein, this provision would seem to resolve the second issue in TIG's favor.  To so conclude does not, of course, resolve the issue of whether there was a covered net loss in excess of the limits of the underlying insurance.  In the Court's view, that is an issue of fact which, at this point, remains unresolved.  Accordingly, summary judgment is not warranted on this basis.

14.  The third issue (11(c)) appears to be an argument that TIG has stated a valid claim for equitable contribution in addition to its claim for equitable subrogation. TIG cites the Court to **Trinity Universal Insurance Co. v. State Farm Mutual Auto Insurance Co.**, **246 Ark. 1021, 441 S.W.2d 95 (1969),** wherein it alleges that a claim for contribution between carriers was recognized in the following terms:

> The action instituted by Trinity is based upon subrogation, but the relief sought is actually that of contribution, appellant contending at the least, that it paid more than its share of a common liability.

Defendants concede there is legal authority for such a cause of action, although they do not concede that the facts herein will prove it up.  They make the following statement in response to TIG's motion:  "While a primary insurance carrier might, under some circumstances, have a duty to reimburse an excess carrier for amounts contributed to a settlement where the primary policy has not been exhausted, such a duty would arise only if the claims settled were covered under the terms of the primary policy."

-25-

Thereafter, rather than address the substantive issues raised by TIG, defendants revert to the arguments of their own motion, to the effect that there is no coverage under their Policies; that TIG failed to reserve its rights in connection with the settlement; and that Latco has released them. They conclude, not surprisingly, that the Court need not address the issues raised by TIG in its motion.

The Court's view of the matter is that a case might be a proper one for the assertion of *either* equitable subrogation *or* equitable contribution, but not *both*.

A right of equitable subrogation arises when

1) a party pays in full a debt or an obligation of another or removes an incumbrance of another 2) for which the other is primarily liable, 3) although the party is not technically bound to do so, 4) in order to protect his own secondary rights, to fulfill a contractual obligation, or to comply with the request of the original debtor, 5) without acting as a volunteer or an intermeddler.

**St. Paul Fire & Marine Insurance Co. v. Murray Guard, Inc**., 343 **Ark. 351, 37 S.W.3d 180 (2001).**

A right of equitable contribution arises

when two or more valid insurance polices cover a particular risk of loss and a particular accident. . . . [E]quitable contribution serves to guarantee that each insurer pay its equitable share of a loss and that one insurer not profit at the expense of another. . . .

**Columbia Mutual Insurance Company v. Home Mutual Fire Insurance**, **74 Ark. App. 166, 47 S.W.3d 909 (2001).**

Here, TIG's coverage is excess, while defendants' coverage is primary. The risk TIG insured against was that Latco would sustain a loss over and above the amount of primary insurance purchased from defendants. This is not a situation where two primary insurers are seeking to apportion how much of the same loss each will bear. To the extent TIG has a right of recovery against defendants, then, that right is in the nature of subrogation -- not contribution. For these reasons, the Court finds that summary judgment in favor of TIG on this point is not appropriate.

IT IS THEREFORE ORDERED that defendants' **Motion For Summary Judgment** (document #18) is **denied.**

IT IS FURTHER ORDERED that plaintiff's **Motion For Partial Summary Judgment** (document #21) is **denied.**

IT IS SO ORDERED, this 28th day of October, 2005.


  /s/ Jimm Larry Hendren
JIMM LARRY HENDREN
UNITED STATES DISTRICT JUDGE